May it please the court. Prabhat Goyal should have been acquitted at the end of the government's case, and certainly this case should never have been submitted to the jury, because on every single count, the prosecution failed to prove multiple distinct elements of the crime charged. There are securities counts and there are lying-to-auditors counts. On the securities counts, the prosecution was required to prove beyond a reasonable doubt three things that it did not prove at all. First, that generally accepted accounting principles precluded network associates from using sell-in accounting to recognize revenue from certain quarter-end sales to certain, actually one, of its distributors. Second, that if network associates had used the method known as sell-through accounting instead, it would have reported materially lower revenue in each of the quarters that's actually charged in the false filing counts. And finally, the government had to prove that Mr. Goyal knew that the company was reporting revenue in a manner that violated GAAP. On the record in this case, no reasonable juror, even under a civil standard, could have found any one of those allegations proven. Now, on the lying-to-auditors counts, the false statement counts, the charge was that Mr. Goyal lied when he represented to PricewaterhouseCoopers that network associates complied with generally accepted accounting principles and that it had made all material sales terms available to PwC for review. The GAAP charge fails for the reasons I've just articulated. As to the concealment of sales terms, the prosecution had to prove beyond a reasonable doubt first. I'm sorry, Mr. Wexner. You said the reason you just explained. I missed that. What was the reason you just explained? As to the lying-to-auditors counts. No, I'm talking about... Okay, go ahead. As to the lying-to-auditors counts, the government charged that Mr. Goyal lied to the auditors in the management representation letters alleged in two respects. One, because he represented that the company had complied with GAAP. I've already explained why the government absolutely failed to prove a GAAP violation, much less that Mr. Goyal knew that there was one. But in the lying-to-auditors counts, the government also charged... I'm sorry, that's the part I missed. Why did they not prove that he failed to comply with GAAP? You said you've explained this already. I missed it. Right. The theory of all the securities counts is that NAI made materially false statements on its securities filings because it used a method of revenue recognition known as sell-in accounting, which the application of GAAP precluded. There was no evidence whatsoever in this record that the way the company recognized revenue in the quarters charged, or for that matter throughout the period that it used sell-in accounting, violated GAAP. There was no expert testimony, but there was no evidence at all? There was no evidence at all that GAAP was violated. Well, let me say this. The two lay witnesses that the government called, Mr. Stavers and Mr. Winters, who were the audit partner and the audit manager, gave a lot of equivocal testimony like GAAP might have required this, or it probably would have required such and so, or it might have been done different, etc., etc. And for Rule 701 reasons, we think they should not have been allowed to so testify. But they did not testify unequivocally that there was a GAAP violation, even as lay witnesses. The only unequivocal thing that Mr. Stavers testified to was he did answer a hypothetical question about whether if Ingram Micro had had an unlimited right of return, he said that would have violated .5 of FAS 48. The government didn't, number one, he didn't say that there was an unlimited right of return. In fact, if you look at the relevant page, he said, I'm not sure those are the facts of this case. The government alleges what it calls an unlimited right of return only in the first quarter of 1998, which isn't even charged. But in any event, the prosecutor in closing argument conceded that an unlimited right of return, even if one existed, does not defeat sell-in accounting or immediate revenue recognition if the returns can be reasonably estimated and if adequate reserves are set aside. And there was no doubt whatsoever in this case that the company was estimating returns and estimating what the other price concessions were and that PricewaterhouseCoopers was reviewing those estimates and those reserves every single quarter. Were the reserves specifically set aside for this? Yes, absolutely. Well, under GAAP, if you have the reserves, then the unlimited issues is that there's no longer an issue. Yes, Judge Wallace. And that is one of the most fundamental failures of the government in this case. The government conceded. Let me ask you something else. You know, GAAP is, I took accounting in college, but it's really complicated wording. And as I understand, the prosecution listed an expert but never called the expert and then had two accountants that they used as a lay witness but never qualified. Exactly. Now, you indicated that those people also provided information on GAAP. Did they give opinion testimony? They did two things. No, just answer the first question, please. Yes, they gave opinion. Was that objected to? Yes, it was. It was the subject of a, you know, before they were called, it was the subject of a motion in limine and the subject of several colloquies that are included. So the issue is still before us as to whether that testimony was properly before the jury. Yes, we have challenged that testimony, Judge Wallace, on two distinct grounds. First of all, to the extent that they offered opinion testimony and they both answered hypothetical questions and testified at length about this might have changed the accounting or that might have changed the accounting, that was all absolutely inadmissible. But our principal submission is even if you take what these two gentlemen, who the trial judge noted had not done the work of going through all the records to actually conclude anything, even if you take what they said at face value, forget the expert point, they didn't testify, they didn't establish that GAP had been violated in this case. And it's not, as to your point, it's not just that GAP is complicated and GAP is subtle. The prosecution's witnesses, both Mr. Winters and Mr. Collins, agreed with PricewaterhouseCoopers and the SEC that the particular GAP provisions at issue in this case, FAST-48 and SLP-97-2, are particularly complex and require a particular level of application of judgment and expertise. In fact, when the government noticed its expert prior to trial, it argued that expert testimony on FAST-48 was important because these things are so complicated. And the judge himself made clear. He said, look, it's understood that each side is going to be calling experts to testify about what the GAP standards required in this case. It seems to me that the government's case would be weakened substantially if there are reserves that cover these callbacks that can happen. Now, the government did put the controller on of the company, and the controller, as I recall, testified there may be a problem. Was there any other evidence about whether there was sufficient reserves to handle that situation? Absolutely. There was no question. I'll deal with Mr. Collins, who left as controller in the second quarter of 1999. So with respect to the false statements to auditor's accounts, he was gone before even the first of them was charged. He was not called as an expert. He was not qualified as an expert. He could. He was testifying under an agreement with the government, having just pleaded guilty to insider trading. He could never have been qualified as an expert. But the fact shows, and there are dozens of PricewaterhouseCoopers work papers in evidence in this case that show that the returns and the price concessions were being estimated by the company, recorded on the company's books as reserves, and those reserves were being tested each quarter by PricewaterhouseCoopers. If you want to take a sample, just as an example, government's Exhibit 175 in the record itemizes for a particular representative quarter not only the total amount of reserves that have been set aside for each distributor, but it actually breaks down exactly what they're for. Are they for returns? Are they for price concessions? Are they for such-and-so? Are they for such-and-so? And the actual test, there's simply no question in this case that the company was estimating these concessions. It was reserving for them. PwC was reviewing them. And quarter in and quarter out, and year in and year out, PwC was certifying that those reserves were adequate and that the use of sell-in accounting and the company's method of revenue recognition was consistent with GAAP. I mean, as to the government's proof on the securities counts, it completely failed on three independent purposes. Now, I was moving to the... There was evidence of concealment, though. There was. The relevant question with respect to the line to auditor's counts is whether or not there was concealment of the actual sales terms of these quarter-end buy-in arrangements. And there was... The government had to prove, in order to establish these crimes first, that material terms were withheld from PricewaterhouseCoopers, not that certain witnesses didn't recall seeing certain documents or that certain witnesses didn't see certain documents. The government also had to prove, beyond a reasonable doubt, that Mr. Goyal, who everybody agreed was not the person responsible for producing documents or responding to inquiries from the outside auditors, that he actually knew that there had been concealment. Now, Judge Kaczynski, as to both of those points, the government failed in its proof. There was no witness who testified that any sales term was concealed from PricewaterhouseCoopers during the relevant period at all, much less that Mr. Goyal knew about it. And the evidence overwhelmingly shows, quite plainly, that the sales terms in these buy-in arrangements were, in fact, disclosed, both in the form of summaries of the debit memos that were provided and reviewed every quarter, and in the actual debit memos themselves, which were often requested by PricewaterhouseCoopers as part of its quarterly or annual review. And as we illustrate on page 32 of our reply group, these debit memos that relate to sales terms in these quarter-end arrangements with Ingram Micro often referenced the actual buy-in letters that the government is so complaining about. I mean, the government wants you to focus on this question. Did Mr. Stavers and Mr. Winters see the buy-in letters themselves? But that's not the question in the case. The question is not whether these people saw those documents. The question is whether the terms that are referenced in those letters were withheld from PricewaterhouseCoopers. And the plain answer to that is no way, no way. I mean, there is a plethora of documentary evidence in this case. Not that it's our burden, but if you look just at the documents that are referenced in footnote 1 of our topside brief, you will see workpapers of PricewaterhouseCoopers analyzing the debit memos, the adequacy of the reserves, the estimations of the returns, all that sort of stuff. Tell me how the debit memos fill in. I understand your argument that the junior auditors may have seen them, et cetera, and they're around. But these debit memos, do they look backwards to what happened the last quarter or are they debit memos that deal specifically with the issue at the particular time involved? No, what a debit memo is, let me answer the question and just express the aspiration that I save a few minutes for rebuttal, recognizing that I may not be able to achieve this aspiration. The way NAI did its accounting and recognized revenue and established reserves, not on the basis of letter agreements, but on the basis of purchase orders, invoices, and debit memos. So when a distributor orders certain material, it sends a purchase order, an actual physical copy to NAI. And NAI then ships it along with an invoice. If there are discounts, price concessions, rights of return, other sorts of concessions or whatever, Ingram Micro or whoever the purchaser is will send a debit memo back to the company which uses that document in order to establish a reserve, estimate a return, or in essence to show the debit on its books. So would they show these buy-in letters, memos, whatever? Yes, if you look, they always show the terms. They have to show the terms. Otherwise, NAI wouldn't know what to put on its books. And if PWC weren't reviewing those, it wouldn't be able to evaluate whether the books balanced or didn't balance. I mean, if you look at on page 32 of our reply brief, you can see one of these. So for all of these memos, buy-ins, et cetera, eventually there will be debit memos that will be consistent with that? The debit memo is what causes NAI to make the counterbalancing entry into its books. Before it actually receives the debit memo, if I sell you product, for example, on March 31st, the end of the first quarter, I'm going to send you an invoice along with the product, and you are later going to send me back a debit memo that says, you promised me a 4% rebate or something like that, and please credit it. The company, and the testimony is unequivocal here, the government concedes it, the company can recognize some revenue at the end of the first quarter on the day that it ships so long as it can estimate what the concessions or returns will be and establishes a reserve. So say on the next to the last day of the quarter, you order from me $100 worth of product, and I ship it to you on that day. In order to be able to record revenue before the quarter ends on the day that I ship, I have to be able to estimate, gee, what kind of a discount am I going to have to give him? I promised him that he can meet the competition if the competition lowers its price. What's that going to be? I have to estimate it, and I have to set aside a reserve in the amount. So say I say, well, you know, given the likelihood that there's price competition and I promised him a rebate and he has a right of return, I'm going to estimate based on history that I'm only going to, 40%, I'm going to have to pay back. So I will recognize revenue of $60 and establish a reserve of $40, and every quarter, PwC goes in and reviews that by asking for whatever records it wants, the invoices, the purchase orders, the debit memos, summaries. We have in evidence in the case a request by PwC in the course of its audit of the third quarter of 1999, which ended September 30th, 1999. In October, they say, one of the things we want you to send us, all this stuff having to do with this, including all of the purchase orders, invoices, and debit memos through the end of October. They get it, and as the documents here show, they include debit memos that reflect the terms of the buy-in agreements, specifically by which agreement, which item, which number per the attached buy-in letter. So, yes, the debit memos come in after the time of the actual sale. The accounting question, the concealment question, is whether or not the company is estimating what the concessions will be, reserving for them, and when PwC asks to do its review, the documents it requests and the terms that it wants to know about are being provided to it, and no witness testified that sales terms were being withheld from PwC in any way. The closest they get, and your question a long time ago referenced this, is Mr. Collins, the former comptroller, in some sort of drive-by comment says, well, I personally didn't turn over, not the debit memos, I didn't turn over to them the buy-in letters. Well, the buy-in letters are largely irrelevant if the debit memos were fairly, and the accounting records were fairly presented, and in any event, the notion that you can attribute what he did in a prior period to something that Mr. Goyal must have known that he did, when he acknowledged he never told Mr. Goyal that, when he acknowledged that there were many people in the company who had access to these buy-in letters and he had never instructed anybody not to be entirely forthcoming with PwC, I don't understand a world in which somebody like Mr. Goyal goes to prison on the basis of some drive-by conclusory statement by a cooperating government witness that he himself, on his own initiative, didn't turn over certain documents that are in any event irrelevant. May I reserve my 42 seconds? This is the Twinkie defense, the drive-by defense. Thank you. We'll give you some time. I will hear from the government. May it please the Court, I'm Amber Rosen representing the United States in this matter. I'd like to turn first to the issue of whether there was sufficient evidence of the falsity, which we, of course, believe that there was. But before getting to that specifically, I want to make it clear that evidence of falsity was not required for either count two, the broader securities fraud count, or for the line to the auditor's count. The line to the auditor's count was based on the defendant's statement to the auditors representing he was disclosing everything, rather than on the truth or accuracy of the financial statements themselves. I'm not sure I understand that. If the idea is that he lied to auditors because he promised to give truthful statements, how does that not put the truth of the statement into issue? It does put the truth of the statement into issue as to whether it was true that he was giving everything to them. He didn't say that's not what the statement is. He didn't say, I'm giving everything to them. What is it that he's supposed to have misstated? What he misstated was that he was making the disclosure necessary for them to prepare fairly representative financial statements. So how does falsity not enter into that as a condition? If the information, if the results were not false, then what is it he withheld? Well, Your Honor, both for those counts and for count two, it's enough if the statement, for example, the auditors, when they do it, they have to represent, they have to certify the accuracy of the statement. And the auditors testified here that if they had known about these other terms, they couldn't say that the returns were accurate. So his failure to disclose prevented them from being able to do that certification. It's misleading to the extent that they're now representing them. Your premise is not that the financial statements were correct, but they didn't actually get all the information they needed to certify them. I mean, I come back to the same point. I don't understand how you can say falsity is not on the table. It seems to me the whole case is premised on falsity. Well, it is for counts three through ten. The reason, let me do it in the context of count two, which is the broader securities fraud count, where what was needed to be proved was that they were false or materially misleading due to defendant's intentional failure to disclose the buy-in letters and the role of net tools to the auditors and the shareholders. And they were materially misleading. And the reason they were materially misleading was because they certified that they were accurate. And there was direct testimony by the auditors that had they known of this other information, they could not certify that the documents were accurate. Whether or not they were in fact accurate is really not the point. And defendant's claim that it is is a little bit like arguing, you know, if I bribe a judge to get a particular outcome in a trial, it's not bribery if I would have gotten that outcome anyway. But, of course, it still is because it, one, corrupts the process and, two, I've got to tell you that you're trying so hard to persuade me that you don't have to prove the statements are false just rings alarm bells all over the place. So I hear what you're saying. I don't believe much of it, but I hear what you're saying. Might want to move on to something else. Okay. I just want to, I will move on to something else. I just want to add, and as I say, it's not for all to count, but I do think that the fact that the statements could not, they couldn't fairly represent that they were true based on his failure to disclose is a problem. They are materially misleading because he's preventing the risk that they could be false. He's preventing even the possibility for the auditors to determine whether or not the evidence needed to be reported. Excuse me? How does he know this? I mean, these people show up at trial years later and say, if we had known this, we wouldn't have been able to. But, you know, don't you have to at least prove, I mean, put aside the falsity point, don't you at least prove that he had reason to believe this would be material, that this is something that the auditors would have wanted to know, and that he concealed it knowing that this is something they wanted to know? Yes. We obviously had to present evidence from which a rational juror would have found that. And what was that evidence? So, first of all, the auditors said, we never saw the buy-in letters. We didn't know about the true role of net tools. Well, the senior auditors said that. The guys at the top, but they're not the guys that go through the file anyway. Correct. Although they said, had my team, I had reason to believe that my team didn't see this either. Had they seen it, they would have brought it to our attention. I saw that. He doesn't say what those reasons are. He just says he has reason to believe. Well, no, he does give the reason. The reason is, if they had seen it, they would have brought it to his attention because that was important information to know. But they had seen it and realized the implications of it. I mean, it's true that the junior auditors go through lots of papers, just like lawyers go through lots of papers. It's not unheard of for juniors to zone out and perhaps miss something they should have shown to their superior. How does that prove concealment? Well, it was certainly evidence from which the jury could use to infer defendant concealment. And that's all that's necessary to. The evidence must be viewed in the light most favorable to the government. On top of that, there was insider information. The controller of the company said, I purposely didn't turn these letters over. One, because I believe the defendant didn't want me to. And two, because I knew they would ruin revenue recognition. I mean, the defendant's whole scheme here is to not disclose these buying terms, to buy and deal in. So we're attributing guilty knowledge to the defendant here because his controller said, I didn't do it because I thought the defendant would want me to? I mean, it's quite different from saying, he told me not to and that's why I did it. But saying, I didn't think he would want me to, you know, I must tell you there are lots of times that people assume my motives for something. You know, we always assume the worst, too. I was thinking about my kids, actually. You know, people do that all the time, as you know, in human interactions. Say, oh, I better not say this because there will be a terrible reaction. And then, you know, you say it and it turns out it's not a big deal. So people make assumptions. You can't live in the world without making certain assumptions about what people think or want to believe. But that's really quite different from saying that the things that people assume about you are true about you. I mean, I'm... Well, I have two responses to that. The first is, again... Why don't you give me the best one? Well, I think you're both good, so I was hoping to give you both. The first is quick, which is, you know, again, the jury can make the inference. There was evidence there from which they could make the reasonable inference that Collins, who worked with Goyal every day, would have some sense of what he wanted him to do in his job. And your better response is? And that that's not all that we had. There was more than that. But it's a criminal case, and saying the jury can infer that I am who people think I am or I think what people think I think without any evidence that I actually communicated this, I mean, that's a very... That's a terribly slender reason on which to send somebody to prison. Well, that's why there's more. There's also... That's why I said you have a... What is the better reason? There's also the fact that Borman, also an insider high up in the finance department, the treasurer of the company, testified that the quarterly financial reports that we published with the press releases were false as to revenue recognition. He said that straight out. We also had the fact that Goyal was meeting with the... Did you prosecute him for that? I believe there was an agreement with him. I can't remember now exactly if he was prosecuted or not. I mean, he says, I was putting out false things, and by God, I hope you screwed a book at him. I don't know exactly if he had an immunity agreement or if he was prosecuted. I think there was some cooperation that he had with the government. What does that have to do with defending this case? The point is that there was another insider from the finance department who knew what they were doing, that the financial statements seemed... Did he say that Goyal told him to put out these false things? He said that he met with Goyal on at least a weekly basis, even more often during when the quarterlies were toward the end of the quarter, that Goyal knew that the buy-in terms were needed to meet the revenue numbers, that Goyal and he discussed the buy-in terms... I'm sorry, you mumbled right there. This is very important. Can you say what it is that he attributed to Goyal? He said that Goyal, and then you mumbled. I'm sorry. Or at least I didn't hear it. I didn't catch it. You know, both Collins and Goyal and Borman worked with Goyal very closely. Goyal and Borman tracked the company... Did either one of them ever say that Goyal told them to do something? No, they did not. Did they ever do anything other than sense that somehow in the air, Goyal must have known what was going on? Because I looked for specifics and I don't find very much. Well, Borman did actually. I mean, he said, look, we were tracking this very closely. Goyal knew that the buy-in deals were needed in order to meet the revenue numbers, and we were trying to meet the revenue numbers. So it seems to me you're coming back to the point where I started, that the whole case really is premised on the proposition that the numbers are false. Isn't that the case? Well, certainly we believe that the numbers were false. What direct evidence was there that the numbers were false? Let's start with the counts that were affected by NetTools because that doesn't impact the reserve issue at all. The reserves were irrelevant to whether NetTools and the company's use of that violated GAAP. So with respect to that, the witnesses involved with the deal, Peterson, Collins, and Ward, they all testified that the entire purpose of NetTools was to make good on Network Associates' promise to Ingram Micro that Ingram Micro would sell through a certain amount of product in the quarter. Winters, the auditor, testified that such a commitment by Network Associates would defeat immediate revenue recognition. He said if Network Associates committed itself that the distributor was being able to sell its product to the end user and to the extent it was falling short in that position, it would either take the product back or buy it itself. That would not be in accordance with .5 of financial accountability. Let me assume for the moment that you've made the case with regard to the NetTools transactions and which method of accounting should have been used. Was there any proof that changing those transactions would have had a material impact in the financial statements? Yes. And let me premise this by saying as I've looked at this, it seemed to me that the materiality case may be the weakest of all because it's premised on a stipulation that can't support its weight and so the government's moved to an alternative theory that doesn't appear to focus on the individual transactions that are being questioned. That is, the materiality seems to assume that if these transactions are misaccounted for, then the other transactions are misaccounted for as well. Why isn't that correct? Because even putting aside the stipulation, Collins and Borman both testified that without the buy-in deal, without the revenue generated from the buy-in terms, they would not have met the revenue target. But they're not... You've given me an argument that turns specifically on NetTools. Did Borman and Collins testify specifically with regard to those transactions by themselves? Not by themselves. NetTools is part of the buy-in. Do you have anything that makes the materiality case for that one set of transactions that you focused on?  But I have evidence for the buy-in. Here's where I get to the broad proposition. It seems to me the government's argument is premised on all of the transactions being misaccounted for because they should have used sell-through instead of sell-in. And yet when we look to see what evidence that says the transactions generally should have been accounted for only through the sell-through method, I don't find anything that speaks to that. Well, Collins and Borman both spoke to the buy-in term, so that includes NetTools, even if it doesn't only refer to NetTools. So let me get to the evidence that the buy-in term also violated GAAP. The two outside auditors, Savers and Winters, both said they weren't aware of the buy-in terms. They didn't take those into account when auditing the statement. Collins said that the reason he didn't turn the letters over to the auditors was because they would ruin revenue recognition. Borman said that the financial statements were not accurate because of revenue recognition issues. Winters explained that to recognize revenue upon sales to the distributor, that the rules require that the price be fixed or determinable. And he said what that meant. He said, and I quote, that there are no concessions provided that can change the price of the software in the future, so that includes future discounts, rebates, and what's not been known at the time of the sale. Then there was testimony, there was actual buy-in letters that showed that there were sell-through rebates, and there was a testimony of the employees about the terms of the deals and that they gave these guaranteed sell-through rebates, which would affect the price, given what Winters said. It wasn't known at the time of the sale. What I find remarkable about the case is that, I mean, which is quite different from a lot of cases we see in criminal laws, you know, after giving immunities, I'm sure, on any number of people, or cutting deals or whatever, and going through all these documents, you haven't found a single thing, you haven't found a single conversation where the defendant said, hey, let's hide the green weenie, or where some document that shows some sort of plan to conceal. There's nothing at all. It's a complete inference case. But the jury can reliably answer that. I haven't seen many of those. What's wrong with that? I've been doing this for some years, and I've not seen very many of those. Usually there's somebody who comes forward and says, yeah, well, you know, we sat in a room, and we went over it, and we agreed that we're going to hide things, and we're going to do this because, you know. And that's how criminal cases tend to be proven. Well, that may be, but the fact that legally a purely inferential case is completely sufficient. But let me just get to my question. You do agree this is a purely inferential case. You don't have a single piece of direct evidence. Well... You don't have a piece of paper with the defendant's name on it in any way that says... I would file in false statements. No, we don't have his admissions, for example. That would make it easier. That would help. And most fraud cases... Well, no, not even saying... It's something short of filing false statements, not even saying, do not send this information to the auditors. Without admitting anything having to do with falsity or anything else, what he says, this information need not be shown, should not be shown. Nothing like that, right? But, you know, the... No, no, I'm just making sure we're on the same page. Nothing like that. Yes, when they asked Collins, you know, did Goyle specifically tell you not to turn these letters over, he admitted, no, he didn't specifically tell me that. But the jury had that. And they could still infer, you know, given the way the department went with the other inference that Goyle was doing this, they could infer that they were purposely not... Why wasn't Collins doing this for his own good? Wasn't Collins the one I'm bonuses to? You know, I don't think... I'm asking a question. I don't think his motive... Did he draw bonuses? Was his compensation pegged to performance? Actually, I don't recall exactly what he said about his own compensation. I mean, clearly, he had profited from this conduct. I mean, everybody in management does well when the company does well. Why wouldn't he have done this on his own? Well, you know, this makes things look good. I don't know. I mean, I don't want to put him up to it or whether he did it on his own. Well, we know he wasn't doing it on his own. Borman was involved in this, too. And he said, you know, he discussed doing these buying terms with Goyle, that Goyle is the one who had to approve them. Goyle was the one who approved NetTool. So Goyle knew what was going on. Could I ask a question? You know, he's the one who's approving it all. He didn't disclose any of this to the board either. It's only Goyle who's at the board meetings. I'm sorry, Judge Wallace. It's all right. I just wanted to ask a question. Yes. You've talked a lot about these buy-in statements. And you've given the cases as near as you see of what happened to these buy-in statements. But as I read the record, there's no question the auditors had access to all the debit memos. That's incorrect. Pardon? That's incorrect, actually. Okay. Tell me why it's incorrect because I thought I understood from Mr. Waxman that there were debit memos that gave all of the necessary information for any buy-in letter. Now, why is it incorrect? The debit memos that Mr. Waxman is referencing were Ingram Micro's copy of the debit memos. And they did have debit memos that referenced these buy-in terms. However, the auditors specifically said in their redirect examinations in trying to clarify all the testimony about debit memos that they never saw those debit memos. They never saw debit memos referencing buy-in letters. That wasn't my question. My question is did they have access to them, not whether they actually saw them. No. What they saw... They were hidden from them? Well, what they saw was a summary or transaction list of the debit memos after the fact. And those didn't have any explanation. That didn't break down what the debit memos were for. So you had millions of dollars passing from NAI to Ingram Micro with no explanation as to why the money was moving? And that didn't cause an auditor to be curious? That the auditors got. The auditors are seeing summaries of the debit memo transactions so they can see whether the books in terms of what's going back and forth are accurate. But they didn't see the documentation. But they could call for it. The auditors often have summaries and say, I need this, this, and this. That didn't happen? No, because you have to keep in mind these letters were to modify the written distribution agreements that the auditors know about. They're done in these side letter agreements. Net tools and some of the other terms were done in verbal agreements. This is a large public... But the money eventually passes. So they didn't know... The money eventually passes, right? The auditors don't track contracts so much as they track money because it's the money they're trying to count up. Now, what this series of transactions does is push revenue recognition earlier. We all understand that. But the money eventually passes. And so your argument is that, look, Ingram gets its money back. And the one sample that's contained in the great brief is $3.6 million. Ingram's receiving money from NAI. But that's what the auditors have to become aware of because they track the money. But there's lots of price concessions and upfront rebates and other things that the auditors do know about that are part of the distribution agreement. So the fact that they have to pay back money... Why is it that it's been concealed from them? Because they don't know that at the time of the sale, of some of the sales, the ones subject to the buy-in and net tools, that those sales, they don't know about these price contingencies at the time of the sale and back when they're reporting them. Now, months later... What do they think this relates to? I mean, we have this one sample, which happens to be dated April 5. That's very soon after the end of the quarter. I don't know if they're all like that. But you have $3.6 million apparently passing soon after that date from NAI to Ingram. The auditor thinks that comes out of the blue? Well, the auditor is seeing these electronic listings of debit memos that, yes, have millions of dollars, and they know that Network Associates is going to owe its distributors money back for returns or for other price concessions that are in the distribution agreement and other things like that. So there are millions of dollars. So you think the auditors don't do anything to inquire as to what these relate to and consider the possibility they relate to deferred discounts for a transaction that actually closed a week earlier? Well, they think they know because they have a distribution agreement. They don't know about these side agreements that have given many more price concessions. But they know about the money. They know about the money. There's been no argument that they're not told about the money that's actually passing. But they don't know about the money until they've already reported the revenue in a previous quarter. So they don't know that the previous quarter was false because they didn't know about these price concessions at the time. How could that possibly be the case? Because the auditors don't complete their work on March 31st. They do their work after the fact. In other words, they're certifying the quarterly report that this is how much revenue we had this quarter. Did they close their eyes to all papers dated after March 31st? No. It said that then the debit memo would come in later because Ingram Micro doesn't know even what... It's April 5th, five days later. The auditors aren't going to know that when they're... No, the testimony... This isn't the year end, but get to the year end quarter. The auditors don't do their work on January 1st. The testimony that the stafers even said this, Look, we're getting the debit memos months later because we're not seeing these price concessions until Ingram Micro has sold through the product. So then after Ingram Micro has made the sale, then they can figure out what the money coming back to them should be. And they send a debit memo. So stafers even said we couldn't have known for the quarter in which we were certifying the revenue. But then they do say it. Do they then say, well, shucks, too bad. But they did. No, I'm just... If they had known about it... They just say, well, too bad. That quarter's gone. We don't... Can they reopen? I think the point is... Can they? Can they ignore it? Reopen. Reopen. Yes, they could have, and they did. And can they take it into account and say, well, okay, I wasn't aware of this for the prior quarter, but this stuff happens, and therefore I will be attentive to this and not close this quarter until stuff like this comes in. Do they just simply say, well, it's too bad. It came in. We ignore it, and we keep ignoring quarter after quarter. Is that what they do? No, but the auditors... Is there any way of concealing things to where it all comes to light a little bit later? But it wasn't coming to light then. I think there's a big misconception about these debit memos, and perhaps the court needs to just go back to the record and read the redirects of both the auditors because the fact is what they said was while we may have seen summary listing of debit memos that just showed the general overall amount that paid back, we didn't know, we couldn't see from those debit memos what this was for. And we thought we knew what they were for because we had the distribution agreements. We had the purchase orders. We thought we knew the terms of the sale, and they weren't being told. They didn't have any reason to believe that there were these kinds of price concessions that were in the buy-in term being done. So they would have had no reason to question the summary listing that they saw. And I think that will become clear perhaps if you go back and look at the record more closely. They were not seeing reasons to give them that they could have known about the buy-in term, and they were purposely being concealed from them. Collin said that, their inside agreement. I understand your argument, but the purposefully concealment issue, these debit memos are right out there. I mean, they're getting them late, but it isn't a concealment. It actually has the terms and sets up reserves, which is consistent with GAAP. Is your argument that they didn't tell them in time so that they would know it? No, my argument is the debit memos that the auditing team saw did not disclose these terms of sale or what the debits were broken down, were being given for. So they could not know about the buy-in term from the fact of the summary listings of the debit memos that they received. They couldn't know it from that, so there wasn't disclosure. Your interpretation of what the debit memo shows is different from Mr. Waxman's. Because Mr. Waxman is talking about Ingram Micro's copy of the debit memo that referenced the buy-in terms, but that's not what the auditors, that's not what Price Waterhouse saw. Price Waterhouse, the two auditors from Price Waterhouse, specifically looked at those and said, I never saw a document like this. And so when those summaries came down, Price Waterhouse never asked for any backup. They just used those summaries? Yes. They did not see the backup of the debit memos. And they never asked for the backup. No evidence they asked for it. They asked for debit memos, and they got summary transaction listings of them. And they got summaries, and then they didn't ask for the debit memos that backup the summaries. Because they had no reason. They're yes or no on doing that? No. Okay. I wanted to address quickly the reserves issue, because I think also there was evidence that the reserves were insufficient for the buy-in deals. And that evidence consisted. Is that in addition to the controller's statement? It was not the controller's statement, no. It was Borman said when he was talking about the quarterly financials that went out with the press releases. He said one reason that those were false was not only revenue recognition, but the balance sheet issues that relate to the lack of reserves or perhaps insufficient reserves. That's what he said. So there was some direct testimony that the reserves were not sufficient. Moreover, staters testified that the auditors didn't know about these terms. So they couldn't have certified whether they were being reserved for properly, because they didn't even know about them. And so what they were certifying was reserves for things that they did know about. So they could not have included these buy-in terms. But it's a long ways from their not knowing to showing that the defendant concealed it. They might not have known because they were careless or stupid, because they dealt with people at the company who thought that these things ought not to be presented. How do you get from their saying we didn't know about it to defendant is guilty of concealment? Well, again, and it's circumstantial evidence that that should be sufficient, there's the fact that they're in side letter agreements and verbal agreements at a large public company. So that's some evidence that the jury could use to infer that the reason that he's doing it in this fashion is to prevent disclosure. Two, the deals were also not disclosed to the board, and Goyle's the one who went to the board. There's the fact that they were, Goyle, if you recall the testimony about these letters, they were representing to Ingram Micro that a lot of the money that they were paying them back was for marketing funds. When, in fact, they were for these price concessions, so they lied about what the monies were for. So that's also further evidence from which the jury could infer purposeful concealment. Can you tell me a little bit about the idea that this was a scam? As I understand it, the ability to sort of sell back some of the product would, so they get paid a certain amount, but the company then on the other side has a chance to send back some of the product. But that comes out of, I mean, it doesn't just go away. What they do is they say, we're going to sell it to our direct customers. So that diminishes the stream of income from their direct customers. So I'm having some difficulty understanding how they come out ahead. Are you talking about NetTools? Are you talking about the use of NetTools? I'm not sure I'm understanding your question. Well, Micro, I get these names, but the company that had that, that was the seller, right, the reseller? Ingram Micro. Ingram Micro, there we go, had the ability to sell back anything it didn't sell, they would get a credit for, right? You're talking about the unlimited right of return? That's it. Okay. But it would come out of sales to direct consumers, right? No. Those are two separate things. If I'm understanding your question correctly, in the first quarter of 98, there was this term that Ingram Micro could return anything it didn't sell within 90 days, the unlimited right of return. That was the only quarter that that was in place for. So that's one issue, and there was testimony about how an unlimited right of return would violate GAAP, where you couldn't estimate, and in this case, the evidence was they had no history of this distributor's channel, so they wouldn't have been able to estimate. But at most, this would buy you one quarter, because the returns would show up in the next quarter. Say that again? At most, this would buy you one quarter. Right. I mean, none of the 98 quarterly returns were charged. It was the fiscal end year 98, so there were three other quarters in 98 with various terms, and, you know, with sell-through rebates and a guaranteed margin and excess inventory fees. So all of those things came into play for the pounds related to 98. So redirecting sales from direct customers, that was what they used NetTools for. In other words, they wanted to sell a lot of products to Ingram Micro to get their revenue up, but Ingram Micro didn't need all of that inventory. Right. And so Ingram Micro said, okay, well, we will buy all of that from you if you will use, and under some conditions, and the condition that came up was Network Associates said, okay, we'll have our subsidiary, NetTools, buy back a certain amount of products to ensure that you'll sell a certain amount of inventory. So what would happen is sales orders would come in to Network Associates from direct customers, and if they needed to get more inventory out of the channel from Ingram Micro, what they would do is they would have NetTools buy it from Ingram Micro, and then Ingram Micro would just sell it to the customer who was trying to buy it. Right. Instead of buying or essentially using the company's own inventory to sell it to consumers. Right. So what I'm saying is, so what that does is... But that's separate from the return issue. Well, it serves as a return. They're channeling the sales from Micro to direct sales. Right. And that's by doing that, they increase their revenue stream over here, but they decrease their revenue stream from direct sales. Well, the point was they had already taken those sales. They'd already sold it to Ingram Micro, and they'd already reported it in the previous quarter. So it's not decreasing the sales to the next quarter in which the sale is actually being made. See, they'd already reported the sale to Ingram Micro. But the revenues from Ingram Micro are being decreased because they're redirecting these sales to their direct sales. But what it does is it means they're not selling other products to their direct customers. Well, because they could only make the sale once. And it was a way to change the timing of the sale. That was the whole theme. At most one quarter, right? Yes, but that was significant because the investors are looking at the quarterly reports, and the company had put out targets for what their revenue would be in a particular quarter. And there was testimony that when a company doesn't make its quarterly revenue target, the stock is likely going to go down. So what they were trying to do was make the revenue target for the quarter. So the timing of it was, I mean, the whole issue was the timing of it. So the effect is that you lower your revenues for the next quarter. Maybe, but it doesn't matter what you're talking about. Look, did they do this for... Maybe you think it doesn't matter, but let's put that aside. There's not a hook in this question. I just want to make sure I understand. And I'll be clear on this. I view this as purely a timing case. That doesn't mean it can't be unlawful, but just to make sure we're all on the same page. Yes, it was, exactly. You're not talking about, and never have been talking about, false revenue and so forth in the long haul. The money is what the money is. Your argument is that the company, and this defendant personally, undertook devices to pull it earlier in time so that each quarter they'd get over the hurdle. You're not trying to say that, and as a result, they manufactured 3 million sales and never took place. So it's purely a timing case. Correct. Yes, and we're not trying to say that at year end, the revenue wasn't the same. You know, we're saying that it's not quarter by quarter. If you pull from your fiscal year, you can pull from the next fiscal year into the earlier fiscal year into the quarter too. Yes. But the case is really presented on a quarter by quarter basis. Exactly. Yes, it was a purely timing case, but the timing was significant because the investors are looking at what the quarterly revenue targets are. Well, they're always looking at the current quarter, right? Exactly. I mean, essentially, this is one quarter shift at most. Yes. I mean, I don't know exactly, you know, whether it's one quarter or two quarter, but, yes, it's the shifting of, you know, the sales. They want to make the sales now, so they make deals with Ingram Micro that Ingram Micro will take more inventory than it really needs right now. They steal from next quarter to pad this quarter. Is that your theory? Say that again? They steal from next quarter's revenues to pad this quarter's revenues. That's your theory, right? Yes, in a sense, yes. I mean, I don't know if they need to actually steal it. They're not really worried about next quarter sales yet. They're just dealing with this quarter's sales, and this quarter's sales don't look like they're going to make the target. They want to get more sales, so please take more inventory. We'll give you lots of discounts, you know, and when you sell it through in the next quarter, we'll figure out how much extra money you're going to make, you know, so that we can report it now. And they're trying to not disclose that because the kinds of confessions they gave were not in accordance with GAAP, and we felt that testimony was sufficient to establish that, given the insider testimony, given what the auditor said about the rules, given what the terms were and the testimony was about that, that the jury could infer falsity and could infer that the defendant was purposely doing it. Okay, thank you. Thank you. Mr. Waxman, we gave the opposing counsel lots of extra time. We'll give you five minutes for about it. I have a lot of misstatements to cover in five minutes, but let me do it as quickly as I can. As to Mr. Collins, as to Mr. Collins, first of all, with respect to his proof as to the false statements and lying to auditors, he was gone before the very first count of the false statements to auditors. The government's witness list included his successor, Terry Davis, the comptroller, but they didn't call him. So his testimony about what he didn't do, having acknowledged that he had assured Mr. Goyal that they were complying in all respects, which he did testify to under oath, proves nothing. Now, Mr. Borman is, A, not even an accountant. B, his testimony didn't relate to revenue recognition. He never even pretended that he was estimating, evaluating reserves or set-asides or debit memos or anything like that. The one thing he did say on direct examination was, oh, you know, I helped Mr. Goyal conceal from the board the full amount of the inventory in the channel. Well, on cross-examination, he had to concede upon documentary evidence that Mr. Goyal had, in fact, presented that very information that he testified under oath they had concealed and that he knew nothing about it. But he had nothing to say and no responsibilities with respect to revenue recognition or PricewaterhouseCoopers. Now, with respect to net tools and the so-called commitment to sell-through product, first of all, it relates only to, at most, three quarters. But in any event, the message line here is that the evidence shows without doubt, without doubt, that PricewaterhouseCoopers, A, was hired to set up net tools, to set up the accounting for net tools. It audited net tools. And the government's own work papers refer to net tools and the use of net tools as a commitment to sell-through accounting. It's in excerpts of record pages 1988, 1990, 1995. And Mr. Winters, who had said, oh, you know, if there's a commitment to sell-through a certain amount of product, that would violate FAS 48. And I didn't know about that. He acknowledged when he saw these documents that he didn't have those in mind. And the fact of the matter is there was no evidence whatsoever to support the expert judgment that even if, as to these few quarters, there was what the government's witnesses called a forecast or a promise or a prediction that they would make certain sell-through numbers as the sales through the channel first started, the accounting question, the legal question in this case, is whether that amounts to, quote, a seller's significant obligations for future performance to directly bring about the resale of the product. PricewaterhouseCoopers didn't think so because it knew all about them and it certified the audits and the reviews. Both of the accounting experts, Mr. Lucas and Mr. Leonard, testified that under no way did the net tools commitment violate prong 5 of FAS 48. And because, if for no other reason, because the trial judge reserved on our mid-trial Rule 29 motion, we are entitled to acquittal either with respect to the state of the government's proof at the end of its evidence or the state of the government's proof at the end of all the evidence in this case. Would you agree that the net tools transaction was at least peculiar? What long-range benefit was there to NAI of structuring the arrangement with Ingram that way? Judge Clifton, the actual testimony about net tools was that it was not peculiar in any respect. It was commonplace in a... I didn't say it wasn't unusual, but peculiar. How does it really benefit NAI? Well, here's exactly... I mean, you know, Mr. Stavers himself, the government's witness, testified that he understood the reason it was set up was because up until the year 1998, when the company had been selling directly to end users and resellers like CompUSA. In 1998, they went to what's called the channel distribution model where they would use these big distributors who carry, you know, thousands and thousands of different computer-related products, Apple computers and, you know, Microsoft products and everything, and they would sell through distributors. Ingram Micro, compared with NAI, was a goliath. You know, it was many, many times larger, and Ingram Micro had to provide some sort of assurances, confidence, in the distributor that it was worth carrying their stupid little software project. And there was testimony from prosecution witnesses that it was unexceptional that to jump-start the channel sales, the vendor would make certain predictions or promises to the distributor that, you know, at the end of the quarter, you'll be able to sell a certain amount. Now, Ms. Rosen says, well, okay, there was only that commitment to a particular run-through rate in the first quarter of 1998. Well, of course, that quarter wasn't even charged, and in any event, PWC knew all about it. Its own work papers show that it knew about it and refer to what NAI's representations to Ingram Micro to be as commitments, as our brief suggests. Now, I just want to cover two other points that I know were important to the panel. One is Judge Clifton's question about timing and materiality. The government didn't even introduce anything that would allow any reasonable juror to infer that this was kicking revenue from one quarter to another in any way that made any material difference, because the government never introduced any evidence at all about how much revenue the company was recognizing on a sell-in basis as a result of these quarter-end deals, or, equally important, how much income revenue the company would have recognized in that quarter if it had been on a sell-through basis, in which case it would have recognized presumably some income from the previous quarter that would have been produced. This isn't just not very much evidence. This is no evidence from which any reasonable juror could infer whether the number was materially higher, materially lower, or even different, and that's completely separate and apart from whether GAAP required the use of sell-through accounting. Now, finally, these bewildering representations about access to the debit memos. I mean, Mr. Stavers acknowledged that there was full access to the debit memos. I will refer the court, as a starting point in the record, to pages 31 through 33 of our reply brief, where Mr. Winters says, question, did you ever ask to look at a debit memo? Answer, my team reviewed debit memos. Question, your team would review the debit memos? Answer, yes. Stavers and Winters also said that, and this is their words, PricewaterhouseCoopers had, quote, full access to NAI's debit memos, and they both testified that they knew of, quote, no limit ever put on their review of debit memos. Now, the timing of the review is completely inconsequential to when the company actually has to record what at the end of the quarter. Judge Clifton, you pointed out that the one example we had was four days after the end of the quarter. And similarly, if you look at the documents and evidence with respect to PricewaterhouseCoopers' request, made at the end of October, that the company turn over all the debit memos for the previous quarter and for the month of October, you will see that the debit memos dated, I think it's also October 4th, that shows give us the following number of millions of dollars on X percent of Y per attached buy-in letter. Now, the notion, the sort of bewildering notion that the copies of the debit memos that are in evidence in this case introduced government exhibits, which are all listed, don't have the information that NAI had, and therefore PricewaterhouseCoopers didn't know it, is, I mean, I don't know where this comes from. It says on it it's the vendor's copy. There's no reason to believe the vendor is NAI. There's no reason to believe that NAI didn't get a copy of these debit memos because it wouldn't have paid money to Ingram Micro if it hadn't. I mean, the notion that somehow the government has satisfied its burden because the copies it chose to use of these debit memos were copies that it had, photocopies it had obtained from Ingram Micro is just astonishing in a criminal case in which the government bears the burden of proof beyond a reasonable doubt. I see that my five minutes has expired. Thank you. Thank you. Our case has now been submitted. We are adjourned.
judges: Kozinski, Wallace, Clifton